# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 16, 2025        Decided October 3, 2025

No. 24-7081

DEUTSCHE TELEKOM, A.G.,
APPELLEE

v.

REPUBLIC OF INDIA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01070)

———

*Andrea Menaker* argued the cause for appellant. With her on the briefs were *Nicolle Kownacki* and *Weiqian Luo*.

*James H. Boykin III* argued the cause for appellee. With him on the brief were *Shayda Vance*, *Carter Rosekrans*, *Winthrop Jordan*, and *Malik Havalic*.

Before: SRINIVASAN, *Chief Judge*, KATSAS, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: Deutsche Telekom, A.G., a German telecommunications company, obtained a nearly $100 million arbitral award against India in Switzerland, after the arbitral panel rejected India's contention that the governing arbitration clause did not extend to the dispute between those two parties. Deutsche Telekom petitioned the district court to confirm the award, and India filed a motion to dismiss.

The district court confirmed the award. It rejected India's arguments for dismissal based on sovereign immunity and *forum non conveniens*. And it held that India's substantive defenses to confirmation were either foreclosed by the arbitral agreement or forfeited. We hold that the court properly denied the motion to dismiss but improperly declined to consider India's substantive defenses.

I

A

The Foreign Sovereign Immunities Act (FSIA) makes foreign governments "immune from the jurisdiction of the courts of the United States" unless a specific FSIA exception applies. 28 U.S.C. § 1604. One such exception covers petitions "to confirm an award made pursuant to … an agreement to arbitrate," if "the agreement or award is or may be governed by" a United States treaty "calling for the recognition and enforcement of arbitral awards." *Id.* § 1605(a)(6)(B). This exception requires three elements: (1) an arbitration agreement, (2) an arbitral award, and (3) a treaty potentially governing confirmation. *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024). We have held that a private party seeking enforcement of an award against a foreign sovereign bears the burden of production as to these elements and, if this burden is met, the foreign sovereign then bears the burden of proving that

the exception does not apply.  *See id.*; *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).

A foreign sovereign resisting enforcement of an arbitral award may raise merits defenses as well as jurisdictional ones based on immunity.  This case involves merits defenses provided under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, which is popularly known as the New York Convention.  The Convention is a multilateral treaty requiring signatory countries to enforce arbitral awards made in other countries.  N.Y. Convention art. I.1; *see Republic of Argentina v. AWG Grp., Ltd.*, 894 F.3d 327, 332 (D.C. Cir. 2018).  As relevant here, the Convention permits signatory countries to refuse "[r]ecognition and enforcement" of a foreign arbitral award on various grounds, including if the award resolves a dispute outside the scope of the parties' agreement to arbitrate.  N.Y. Convention art. V.1(c)

The Federal Arbitration Act (FAA) implements this Nation's obligations as a signatory to the New York Convention.  The FAA provides a cause of action to confirm foreign arbitral awards—*i.e.*, to convert them into enforceable legal judgments.  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021).  The FAA requires confirmation unless one of the grounds for refusal in the Convention is present.  9 U.S.C. § 207.

Courts treat jurisdictional defenses under the FSIA and merits defenses under the New York Convention differently.  Most notably, courts must determine for themselves questions regarding jurisdictional defenses—including factual questions bearing on the defenses.  *Hulley Enters. Ltd. v. Russian Federation*, 149 F.4th 682, 688 (D.C. Cir. 2025).  In contrast, the availability of merits defenses may turn on the scope of the

arbitration agreement. For example, parties may agree to have the arbitral panel decide whether particular disputes fall within the scope of the agreement to arbitrate. *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 33–35 (2014). And if they do so, courts will not consider arguments about arbitrability raised as enforcement defenses under Article V.1(c) of the Convention. *See Stileks*, 985 F.3d at 878–79; *Chevron*, 795 F.3d at 207.

This framework makes it important to distinguish between jurisdictional and merits defenses in confirmation actions. Under our precedent, an objection challenging the existence of an arbitration agreement counts as a jurisdictional defense, while an objection that the dispute falls outside the scope of an arbitration agreement counts only as a merits defense under the New York Convention. *See NextEra*, 112 F.4th at 1101; *Stileks*, 985 F.3d at 877–79; *Chevron*, 795 F.3d at 205–06.

Because the FSIA affords an immunity from litigation burdens as well as from adverse judgments, a foreign sovereign may elect to defend confirmation proceedings in two phases. *Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020). First, sovereigns may raise colorable immunity defenses under the FSIA and pursue interlocutory appeals if those defenses are rejected. *Id.* at 579, 583. Second, if those efforts fail, sovereigns may then raise merits defenses under the New York Convention. *Id.* at 586.

B

This appeal arises from a bilateral investment treaty (BIT) between the Federal Republic of Germany and the Republic of India. The BIT governs investments that investors of one country make in the other. It defines an "investment" to include "every kind of asset invested." J.A. 170. And it defines "investors" as "nationals or companies of" one

signatory country "who have effected or are effecting investment in the territory of" the other. *Id.* at 171.

Article 9 of the BIT provides for arbitration of any investment dispute between an investor of one signatory country and the other country. *See* J.A. 176. It states that such arbitration will be "in accordance with" the Rules on Arbitration of the United Nations Commission on International Trade Law (UNCITRAL). *Id.* Article 9(2)(b)(v) states: "The decision of an arbitral tribunal shall be final and binding and the parties shall abide by and comply with the terms of its award. The award shall be enforced in accordance with national laws of the Contracting Party where the investment has been made." *Id.* at 177.

C

In 2005, Antrix Corporation Ltd., a space company wholly owned by the Republic of India, entered into a venture with Devas Multimedia Private Ltd., a privately owned Indian company that provides satellite-based telecommunications. Antrix agreed to lease Devas a portion of the electromagnetic spectrum on two satellites that Antrix would launch into space. Devas would provide multimedia services throughout India. A few years later, Deutsche Telekom, A.G., a German telecommunications company, agreed to invest nearly $100 million in Devas through a Singaporean subsidiary. In exchange, Deutsche Telekom would receive about 20 percent of Devas's shares.

In 2011, India decided to retain the relevant spectrum for other uses. It caused Antrix to terminate its deal with Devas. Deutsche Telekom argued that India, in taking these actions, violated its obligation under the BIT to fairly treat investments

by German investors. Pursuant to the BIT, Deutsche Telekom initiated arbitration against India in Switzerland.[1]

Before the Swiss tribunal, India objected that the dispute was not arbitrable under the BIT. India argued that Deutsche Telekom was not a covered investor because its investment in Devas occurred through another, Singapore-based entity. India further argued that Devas's activities in India were not covered investments, but rather pre-investment activities. The panel rejected these arguments, ruled for Deutsche Telekom on the merits, and issued an interim award.

India asked the Federal Supreme Court of Switzerland to set aside the award for lack of arbitrability. That Court reviewed *de novo* India's arguments about the lack of any covered investor or investment, and it rejected them on the merits. Tribunal fédéral [TF] Dec. 11, 2018, 4A_65/2018. After the arbitral panel issued a final award for $93.3 million, India sought revision in the Federal Supreme Court, which again ruled for Deutsche Telekom. TF Mar. 8, 2023, 4A_184/2022. Courts in Germany and Singapore also rejected these arguments and confirmed the award. *See* J.A. 1698 (Higher Regional Court of Berlin); *id.* at 1745 (Singapore International Commercial Court).

## D

Deutsche Telekom next petitioned for confirmation in our district court. India moved to dismiss the action on grounds of sovereign immunity and *forum non conveniens*. As to immunity, India again urged that the dispute involved no investor or investment covered by the BIT's arbitration clause.

---

[1] Devas initiated a separate arbitration against Antrix in India, which gave rise to the enforcement proceedings discussed in *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572 (2025).

India reserved its right under *Process & Industrial Developments* to raise New York Convention defenses after the immunity issues were finally resolved.

The district court denied India's motion to dismiss and confirmed the award. First, the court held that *forum non conveniens* is unavailable in proceedings to confirm international arbitral awards. *Deutsche Telekom AG v. Republic of India*, No. 21-cv-1070, 2024 WL 1299344, at *2 (D.D.C. Mar. 27, 2024). Next, it concluded that India's argument that the dispute involved no investor or investment covered by the BIT implicated the arbitration agreement's scope, not its existence, and thus did not bear on jurisdiction under the FSIA. *Id.* at *3. The court then rejected that argument as a merits defense under the New York Convention. It reasoned that Germany and India had agreed to let the arbitrators decide questions regarding the scope of the arbitration agreement, thus foreclosing any judicial review on those questions. *Id.* at *4. Finally, the court held that because India's investor and investment arguments were not colorable as immunity defenses, India had forfeited any other merits defenses by briefing them. *Id.*

On appeal, India challenges each of these rulings. We begin with the denial of its motion to dismiss. Then, we address the decision to confirm the award.

## II

The district court correctly rejected India's arguments for dismissal based on immunity and *forum non conveniens*.

## A

The court correctly held that the FSIA's arbitration exception to immunity applies in this case. As explained

above, the exception requires (1) an arbitration agreement, (2) an arbitral award, and (3) a treaty potentially governing confirmation. *See* 28 U.S.C. § 1605(a)(6); *NextEra Energy*, 112 F.4th at 1100. Deutsche Telekom pointed the district court to (1) the arbitration clause in the BIT, (2) the Swiss arbitral award, and (3) the New York Convention. This easily satisfied its burden of production regarding the arbitration exception. *See id.*; *Chevron*, 795 F.3d at 204 & n.2.

To rebut this showing, India reiterates its contentions that the dispute here involved no investor or investment covered by the BIT—no covered investor because Deutsche Telekom invested in Antrix through a Singaporean subsidiary, and no covered investment because its activities (or those of the subsidiary) involved only preparations to make an investment. Our precedent squarely treats arguments like these as merits defenses under the New York Convention, which do not deprive the district court of jurisdiction under the FSIA's arbitration exception. For example, in *Stileks*, we classified as non-jurisdictional an argument that the party seeking confirmation was not an "investor" protected by the governing treaty and arbitration clause because it had acted through a subsidiary company in a non-signatory country. *See* 985 F.3d at 878. Likewise, in *Chevron*, we classified as non-jurisdictional an argument that the party seeking confirmation had not made an "investment" covered by the governing BIT. *See* 795 F.3d at 205–06. These decisions do not speak to the merits of India's arguments regarding whether this dispute involves investors and investments protected by its treaty with Germany. They do, however, foreclose any contention that these arguments bear on subject-matter jurisdiction or the applicability of the FSIA's arbitration exception.

9

B

The district court also correctly refused to dismiss this case on *forum non conveniens* grounds. This Court repeatedly has rejected application of that doctrine in proceedings to confirm international awards, where the whole point is to enforce awards against assets in jurisdictions other than where the underlying dispute arose. *See, e.g., Tatneft v. Ukraine*, 21 F.4th 829, 840 (D.C. Cir. 2021); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 303–04 (D.C. Cir. 2005).

India responds that dismissal is required under Article 9(2)(b)(v) of the BIT, which states that an arbitral award "shall be enforced in accordance with national laws of the Contracting Party where the investment has been made." J.A. 177. India construes this provision to mean that for an alleged breach of the investment treaty that occurred in India, enforcement may occur only in India. We disagree. As explained more fully below, Article 9(2)(b)(v) may bear on choice-of-law questions regarding enforcement. But nothing in that provision limits enforcement actions to the territory of the offending sovereign.[2]

---

[2] In this Court, India also briefly contends that the district court should have dismissed the confirmation action because India lacks sufficient contacts with the United States to support the exercise of personal jurisdiction. This argument is riddled with fatal problems. First, India failed to raise it below, and personal-jurisdiction arguments are subject to forfeiture. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04 (1982). Second, the Supreme Court recently has held that neither the FSIA nor the Fifth Amendment requires a defendant to have minimum contacts with the United States. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025) (Fifth Amendment); *CC/Devas (Mauritius Ltd.)*, 145 S. Ct. at 1579 (FSIA). Third, this Court has held that foreign sovereigns are entitled to no Fifth Amendment

10

III

In our view, the district court erred in granting the motion to confirm the award without further considering the merits defenses that India seeks to pursue.

A

After construing India's investor and investment arguments as merits defenses, the district court proceeded to foreclose them. It concluded that the BIT had delegated to arbitrators the exclusive authority to decide if the relevant dispute falls within the scope of the BIT's arbitration provision. *Deutsche Telekom*, 2024 WL 1299344, at *4. On that understanding, the court deferred to the arbitrators' conclusion that the dispute here involves a covered investor and investment, refusing to consider those questions as enforcement defenses under the New York Convention. *See id.* India contends that the district court erred in foreclosing those defenses. Deutsche Telekom defends the district court's reasoning and seeks affirmance on the alternative ground that courts in Switzerland, Germany, and Singapore have also resolved the investor and investment questions against India.

1

Arbitration is a matter of contract, so the parties control the scope of any arbitration agreement. They may vest arbitrators with the power to conclusively resolve questions about whether the arbitration agreement extends to the dispute at issue—*i.e.*, whether that dispute is arbitrable. *See*, *e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63,

---

protections regardless. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95–100 (D.C. Cir. 2002).

67–68 (2019). However, "courts presume that the parties intend courts, not arbitrators, to decide what [are] called disputes about 'arbitrability.'" *BG Grp.*, 572 U.S. at 34. So, the parties must speak "clearly and unmistakably" to overcome this presumption and authorize arbitrators to conclusively resolve questions about the scope of the arbitration agreement. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (cleaned up). In assessing that question, courts apply ordinary principles of contract and treaty interpretation. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *BG Grp.*, 572 U.S. at 37. Those principles operate against the backdrop of domestic and international law. *See*, *e.g.*, *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11–13 (2014). And that triggers a second clear-statement rule: Parties must speak clearly to displace the backdrop. *See GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440–41 (2020).

To find the necessary clear and unmistakable contract language, Deutsche Telekom points to the BIT's express incorporation of UNCITRAL arbitration rules, which provide that the "arbitral tribunal shall have the power to rule on objections that it has no jurisdiction." UNCITRAL Arbitration Rules art. 21.1 (1976). We have twice held that a treaty's express incorporation of these rules in its arbitration agreement supplied the necessary "clear and unmistakable" language to empower the tribunal to conclusively resolve questions about the scope of the agreement. *See Stileks*, 985 F.3d at 878–79; *Chevron*, 795 F.3d at 207–08. But nonetheless, the ultimate touchstone is the parties' intent, and "context matters" in determining it. *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021). So, if an "arbitration agreement is narrow[], vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of

rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference or intent to arbitrate arbitrability." *Id.* at 319.

Here, several considerations cut against treating the incorporation of UNCITRAL rules as dispositive. For one, it appears that German and Indian law *always* permit courts to review arbitrability, even when arbitrators have opined on the issue themselves. *See* BGH, July 24, 2014, III ZB 83/13, at 7, juris (Ger.), https://perma.cc/23BV-N8TX ("It is true that in arbitration proceedings the arbitral tribunal itself first decides on its jurisdiction …. However, the state court has the last word."); *Chloro Controls (India) Priv. Ltd. v. Severn Trent Water Purification*, (2013) 1 SCC 641, ¶ 129 (India) ("The arbitrators are to be not the sole judge but first judge, of their jurisdiction."). Because the BIT was "drafted against the backdrop" of this domestic law, it would be "unnatural to read" its arbitration provisions as displacing that law. *GE Energy*, 590 U.S. at 440.

Moreover, the BIT expressly incorporates background principles of German and Indian law in confirmation proceedings. As noted above, Article 9(2)(b)(v) states that an arbitral award "shall be enforced in accordance with national laws of the [country] where the investment has been made." J.A. 177. Here, that country was India, and its law sharply distinguishes between authorizing arbitrators to consider arbitrability on the front end and foreclosing courts from doing so on the back end. That view gives meaningful effect to the UNCITRAL rules, which by their terms merely authorize the arbitral tribunal to consider its own jurisdiction. And it appears more consistent with the international understanding of what are generally referred to as "competence-competence clauses." *See Blanton v. Domino's Pizza Franchising LLC*,

962 F.3d 842, 849 (6th Cir. 2020) ("And there's reason to think that these clauses—when first added to the rules of arbitral institutions almost a century ago—were not meant to give arbitrators the exclusive authority to decide their jurisdiction. They simply confirmed that arbitrators could address their jurisdiction." (citing Hulbert, *Institutional Rules and Arbitral Jurisdiction: When Party Intent Is Not "Clear and Unmistakable,"* 17 Am. Rev. Int'l Arb. 545, 551–63 (2006))).

We emphasize the narrowness of our analysis. We do not retreat from the holdings in *Chevron* and *Stileks* that express incorporation of the UNCITRAL rules can suffice to establish a clear and unmistakable delegation to arbitrators to conclusively resolve disputes about arbitrability. But unlike in *Stileks* or *Chevron*, we are confronted here with evidence that cuts *against* an intent to delegate arbitrability exclusively—namely, strong background principles of German and Indian law and a treaty clause expressly invoking these countries' award-confirmation laws. Under these circumstances, we see no clear and unmistakable intent to bar courts from considering arbitrability defenses that the New York Convention expressly provides for in the specific context of enforcement.

For these reasons, the district court erred in concluding that the BIT delegated to arbitrators the exclusive and unreviewable authority to make arbitrability determinations. The arbitral decision rejecting India's argument that this dispute involves no investor or investment covered by the BIT does not bar India from raising that argument as a merits defense under Article V.1(c) of the New York Convention.

2

Deutsche Telekom asserts issue preclusion as an alternative ground for affirmance on this point. As it notes,

courts in Switzerland, Germany, and Singapore have rejected India's argument that the dispute involved no covered investor or investment. Deutsche Telekom is also correct that United States courts often give preclusive effect to foreign judgments as a matter of international comity. *See*, *e.g.*, *Hilton v. Guyot*, 159 U.S. 113, 163–67 (1895); *Donnelly v. FAA*, 411 F.3d 267, 270–71 (D.C. Cir. 2005). And such preclusive effect might extend to foreign judgments confirming arbitral awards. *See* Restatement (Third) of U.S. Law of Int'l Com. & Inv.-State Arb. § 2.11.

We decline to consider this preclusion argument here. The district court did not reach that question, and the parties did not substantially brief it here. So, as we recently did in *Hulley Enterprises*, we leave the question of international issue preclusion open for the district court to consider in the first instance on remand. *See* 149 F.4th at 692.

## B

Beyond the question of covered investors and investments, the district court also foreclosed India from raising any other merits defenses under the New York Convention. These include possible defenses that a national-security exception in the BIT precluded arbitration here and that the Devas-Antrix agreement was procured by fraud. Under *Process & Industrial Developments*, a foreign sovereign may raise and appeal colorable immunity defenses before it can be forced to defend on the merits. *See* 962 F.3d at 584–86. The district court held that India's arguments about covered investors and investments were not colorable as immunity defenses. So, it deemed them to be merits defenses, reasoned that India had no right to sequentially raise such defenses, and held that India had therefore forfeited the other merits defenses. *Deutsche Telekom*, 2024 WL 1299344, at *4. We conclude that the

defenses raised were colorable as immunity defenses, which India could have frontloaded without suffering any forfeiture.

Deutsche Telekom urges that India's investor and investment arguments were not colorable as immunity defenses because *Chevron* and *Stileks* had already foreclosed them. But *Process & Industrial Developments* makes clear that an immunity defense may sometimes be colorable even in the face of adverse precedent. For one thing, we derived the colorability requirement from *Bell v. Hood*, 327 U.S. 678 (1946), which held that some claims are "too insubstantial" on the merits even to support federal-question jurisdiction. *See Process & Indus. Devs.*, 962 F.3d at 583. That formulation suggests only a modest colorability requirement. Moreover, we found colorable for immunity purposes an argument that the arbitration exception did not apply to an arbitral award that another court had already vacated. *See id.* at 580–84. Yet that argument *was* foreclosed by an earlier precedent, as we later explained in definitively rejecting the asserted immunity. *See Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 27 F.4th 771, 776 (D.C. Cir. 2022) (citing *Diag Human, S.E. v. Czech Republic–Ministry of Health*, 824 F.3d 131, 137–38 (D.C. Cir. 2016)).

Furthermore, there are good reasons for keeping the colorability requirement modest. For one thing, litigants routinely and legitimately assert aggressive distinctions of seemingly binding precedent, so a foreign sovereign should not forfeit its right to a threshold immunity determination simply by raising difficult immunity arguments that courts later reject as foreclosed by precedent. For another, even if some precedent does clearly foreclose an asserted immunity, the foreign sovereign still might have a colorable basis for seeking further review by way of *en banc* or *certiorari*. In this case, the line our immunity precedents have drawn—between

cognizable challenges to the *existence* of an arbitration agreement and non-cognizable claims about its *scope*—is neither self-evidently correct in principle nor obvious in its application to specific cases. Indeed, it is presently the subject of a pending petition for *certiorari* supported by four European sovereigns and the European Commission itself. *See* Petition for Writ of Certiorari, *Kingdom of Spain v. Blasket Renewables Invs. LLC*, No. 24-1130 (U.S. May 1, 2025) (seeking review of *NextEra*, 112 F.4th 1088). Sometimes, of course, precedent will make a claim "wholly insubstantial and frivolous," *Bell*, 327 U.S. at 682–83, and thus not even colorable for immunity purposes. In our view, the immunity arguments raised here by India easily cleared that modest hurdle.

Because the immunity arguments here were colorable as such, India did not forfeit its right to raise merits defenses after the immunity question was finally resolved against it. We decline Deutsche Telekom's invitation to nonetheless affirm because India's remaining merits defenses are (1) precluded by foreign courts' judgments, (2) forfeited because India failed to raise them in arbitration, or (3) otherwise meritless. We express no view on these contentions, which remain open for the district court to consider in the first instance on remand.

## IV

We vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*So ordered.*